NOT RECOMMENDED FOR PUBLICATION
File Name: 21a0381n.06

Case No. 20-3969

# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

GREGGORY BLANK,

    Plaintiff-Appellant,

v.

NATIONWIDE CORPORATION,

    Defendant,

NATIONWIDE MUTUAL INSURANCE COMPANY; DEVIN A. PENWELL; LAURA M. GLINSKI,

    Defendant-Appellees.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**FILED**
Aug 06, 2021
DEBORAH S. HUNT, Clerk

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO

O P I N I O N

---

**BEFORE:  CLAY, McKEAGUE, and LARSEN, Circuit Judges.**

**CLAY, Circuit Judge**. Plaintiff Greggory Blank appeals the district court's order granting summary judgment to Defendants Nationwide Mutual Insurance Company ("Nationwide"), Devin A. Penwell, and Laura M. Glinski on his claims of disability discrimination, interference with his rights under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601–54, and defamation. For the reasons stated below, we **AFFIRM** the district court's grant of summary judgment to Defendants.

**BACKGROUND**

At the relevant time, Greggory Blank worked as the Associate Director of Specialty Material Damage Claims at Nationwide. Blank was in charge of a team of six claims managers—which included Penwell and Glinski—who each supervised eight claims adjusters. In supervising the claims managers, Blank scheduled one-on-one meetings about once a month with the managers to discuss performance reviews, and he conducted mid-year and year-end performance evaluations regarding each manager's overall performance. Blank reported to Matt Hawk, who was the Director of Specialty Material Damage Claims.

Nationwide's Code of Conduct has a "No Harassment, Discrimination or Retaliation Policy" applicable to all employees, which states that Nationwide "do[es] not tolerate any form of harassment, discrimination, and retaliation" based on a protected characteristic. (R. 70, Code of Conduct at PageID # 2597.) Under the policy, employees who learn about an incident that violates the policy must report it immediately to the Office of Associate Relations ("OAR"), a manager, a human resources professional, or the Office of Ethics. Managers and supervisors can be subject to disciplinary action, including termination, for tolerating, allowing, or ignoring conduct inconsistent with the policy. Any retaliation against an employee who makes "a complaint with the reasonable belief that harassment or discrimination or a violation of this policy occurred, or for participating in an investigation," is prohibited and can similarly subject the retaliating employee to disciplinary action. (*Id.* at PageID # 2598.)

On February 28, 2018, Glinski and Penwell were outside a break room at the Tuttle Crossing Nationwide office having a conversation regarding Glinski taking professional photos of Penwell's associates for their Nationwide profiles. During this conversation, Glinski and Penwell began discussing Penwell's upcoming jury duty when Blank entered into the conversation.

According to Penwell, Blank proceeded to tell Glinski and him that "the best way to [escape jury duty] is to walk into the courtroom and say where are those N words" and either "let's get the ropes" or "where are the ropes." (R. 49, Penwell Dep. at PageID # 1467.) Blank's recounting of his comment was that his father's advice on "the best way to get out of jury duty is to show up and ask, 'Okay, where are these people you want me to hang?'"[1] (R. 43, Blank Dep. at PageID # 675.) In his deposition, Blank indicated that that looking back at the situation he realized that Penwell's "demeanor [and] his body language changed when [he] told the story." (*Id.* at PageID # 682.) The conversation between Penwell, Glinski, and Blank ended shortly after Blank's comment. Later that same day, after Glinski spoke with Blank to tell him that the comment was inappropriate, Blank apologized to Penwell via text.

Penwell first reported the comment on March 7, 2018, to Hawk, who told Penwell that he needed to report the comment to OAR or Hawk would have to do so. That same day, Penwell reported the comment to OAR. On March 12, 2018, OAR began its investigation into Blank, with Seema Anand assigned on the case, and Anand interviewed Penwell, Glinski, and Hawk on March 20, 2014, regarding Blank's comments.

Before and during the pendency of the OAR investigation, Blank conducted his regular performance reviews of the managers. Glinski was given a performance rating of a four, indicating a "strong" performance, and Penwell was given a three, indicating a "successful" performance. (R. 43, Blank Dep. at PageID # 646, 650–51.) Blank met one-on-one with Penwell on March 19, 2018, and Glinski on March 21, 2018—before Blank spoke with Anand about the complaint lodged against him—to discuss their measuring results, their teams' performances, and ways to improve team performance.

---

[1] Kyle Waltz, who was working as a claims specialist under Penwell's supervision at this time, was present during this conversation but did not hear the content of the discussion.

On March 21, 2018, Anand contacted Blank to set up a meeting to discuss Penwell's complaint. At the meeting, when Anand asked Blank if he had used the "N word," Blank responded no and said that "they must have taken something out of context or inserted a word." (R. 43, Blank Dep. at PageID # 674.) He was surprised "it was perceived/heard in this fashion" and indicated that "[h]e has always worked with a very diverse team." (R. 41-1, Anand Case Notes at PageID # 558.) Anand proceeded to coach Blank on how that comment was "very inappropriate for the workplace and could hurt feelings," and Blank indicated that he understood this. (*Id.*) Anand informed Blank that his case would be closed given his good record at Nationwide and his diverse team as well as that she had not found anything in Blank's work history indicating that his use of offensive language was typical behavior for him. Anand also informed Blank that he could not engage in any retaliation.

Following the meeting, on March 22, 2018, Blank emailed Penwell for a detailed update on their boat salvage project, noting that it was his "third request for updates on this project."[2] (R. 43, Blank Dep. at PageID # 910.) That evening, Penwell responded by providing an excel sheet "that detail[ed] the current status, bid amounts, auctions, and if a minimum bid has been set" and stating that he "would also be researching any past sale amounts to add to this information (as soon as [he could] find where to locate that information)." (*Id.* at PageID # 909–10.) In his response Blank chastised Penwell for his limited progress on the project and noted that he had "6 months to learn how to use the IAA website, get this initiative under way, track the boat sales data, and provide meaningful analysis." (*Id.* at PageID # 909.) Blank further remarked that he had not been able to provide meaningful data at the salvage meeting that day on the project—which would be "captured as part of [Penwell's] ongoing performance"—and requested that the information be

---

[2] Blank and Penwell first spoke about this project in October 2017, during which time Blank asked Penwell via email to keep track of the boat sales.

provided to him before the following Monday at 8:00 AM or else he would "pull the project from [Penwell]." (*Id.*) Penwell responded on March 24, 2018, with a more detailed analysis of the boat salvage data and a request to "set expectations of how to proceed after [Blank's] review of the results." (*Id.* at PageID # 904–08.)

On March 23, 2018, Blank emailed Glinski regarding letters issued by her team, noting that "in approximately 40% of the 20 files [Blank] reviewed from the first quarter of this year there were grammatical opportunities, incorrect use of capital letters and punctuation, and opportunities surrounding the choice of language and exclusions referenced as they related to the damage being claimed." (*Id.* at PageID # 914.) He also said that, effective March 26, 2018, she was to "send [him] an activity on all denials, after [Glinski] had completed [her] review," which would "continue until [she could] demonstrate zero opportunity adequacy of 90% or better." (*Id.* at PageID # 914–15.) Glinski responded on March 26, 2018, that she would "start forwarding denials to [Blank] today for review" and wanted to schedule a time to meet with Blank to review the 20 files referenced in Blank's email. (*Id.* at PageID # 914.) Blank responded on March 26, 2018, by attaching the spreadsheet he used to randomly select 20 letters to review and saying that he was willing to discuss these files at her next one-on-one meeting but that otherwise he would be focusing on current and future files. He also said that he knew that Glinski had been rewriting her associates' denial letters and that, moving forward, her associates should be writing the letters after which Glinski would conduct a thorough review.

On March 28, 2018, Glinski revised a denial letter based on Blank's activity, and she and Blank disagreed regarding whether a particular weather exclusion applied. After they went back and forth as to the proper analysis of the exclusion, Blank emailed Glinski that she and her associate "ha[d] some opportunity in learning how to pull weather data" and expressing concern

with her approach to the denial/review process. (*Id.* at PageID # 916.) He also noted that he had sent this letter back three times, and not only did she fail to "recognize the missing exclusions," but she also disputed his analysis and coaching. (*Id.*) He then said that she could either correct the letter with the additional exclusion or he could "contact the Office of Associate [R]elations to discuss insubordination." (*Id.* at PageID # 917.) Glinski updated the letter as directed and sent it back to Blank.

Both Penwell and Glinski independently forwarded these email conversations with Blank to Anand and raised concerns that Blank was retaliating against them for Penwell's complaint. On April 2, 2018, Anand set up a conference call with Cathy Hiner, Associate Vice President of Claims; April Compton, Senior Director of OAR; and Amy Spellman, Human Resources Director; to discuss the case. They ultimately decided to place Blank on paid administrative leave starting that day to allow for further investigation. After the conference call, Anand informed Blank that he was being placed on paid administrative leave, during which she told him that the investigation may be related to a previous complaint lodged against him.

As part of the investigation, Anand proceeded to review Blank's emails from the last 30 days to other employees, noting that Blank's "style of communication was direct and harsh in general and particularly pointed when [she] reviewed [Penwell's] and [Glinski's] emails keeping in mind the overall circumstance." (R. 41-1, Anand Case Notes at PageID # 557.) Anand considered Glinski's and Penwell's comments in their interviews with her "that they felt they were treated differently by [Blank] after the complaint was filed and investigated." (*Id.*) She also looked at previous complaints from 2015 and 2016 against Blank that did not result in disciplinary action where Blank had made "inappropriate comments" and demonstrated a tendency to "hold grudges," as well as positive performance reviews for Blank, Penwell, and Glinski. (*Id.*) On April 6, 2018,

Anand met with Nationwide executive leadership to present the case and provide OAR's recommendation, which was to give Blank "a [f]inal written notice (FWN) and a demotion to an individual contributor role." (*Id.*) The recommendation was set to be delivered to Blank on April 9, 2018, at 11:30 AM.

According to Blank, on April 9, 2018, Anand sent a message to Blank to remind him of their meeting at 11:00 AM to discuss the retaliation accusation against him, which Blank did not know about prior to this message. Blank indicated that he was not aware of the retaliation accusation and that Anand made it seem as though any decision as to how to resolve the case against him was final. However, after the initial call, Anand called Blank back to let him know that the meeting was rescheduled to later that afternoon at 2:00 PM and that he would have an opportunity to speak as to the accusations against him. Blank told Anand that he disagreed with the accusation of retaliation, that Hawk had reviewed all the e-mails he sent to Penwell and Glinski before he sent them, and that he had up until this point performed well in his role as Associate Director. At the 2:00 PM call, Hiner informed Blank that he was being given a final written notice and a demotion to an individual contributor role. Blank was unhappy with the results and indicated that he would be filing a complaint with the Office of Ethics.

During the 2:00 PM call in which Blank was demoted, Blank revealed that he was on FMLA leave and would not be returning to work until May 5, 2018—OAR was not previously aware of Blank's FMLA leave, but Hawk was, having just received notice of it before the meeting. For over a year, Blank had been seeing a rheumatologist for his chronic pain, and he had been communicating with Hawk, Hiner, and Associate Director Allocco about his health problems while continuing to work. Blank's affidavit indicates that he was diagnosed with fibromyalgia and depression in February 2017, at which time he began a medication regimen, but, in his deposition,

he said that he was not formally diagnosed with fibromyalgia until April 5, 2018. Additionally, Blank claims that he filed his claims for FMLA leave and short-term disability no later than the morning of April 6, 2018. But Blank's FMLA file indicates that he initiated his FMLA claim on April 9, 2018, at 11:44 AM, following his call with Anand. His FMLA claim was approved, and he took the twelve-week leave allotted under the statute.

After the call, Blank filed a complaint with the Office of Ethics alleging that the OAR investigation was influenced by bias and that the individuals working on the investigation did not understand the work dynamics in his department. April Compton was ultimately assigned to his Office of Ethics complaint, who, after the initial intake and discussion, agreed not to contact Blank until he was cleared to go back to work by his doctor. Blank was eventually replaced by Melissa Bryant, who was previously working as a manager in the Material Damages department. Blank came back to work at the end of his twelve-week leave in his new role as claims specialist in the Total Loss division but worked from home. In April 2019, Blank was notified that his position was going to be eliminated as the entire Total Loss division was being eliminated as part of a reduction in force across the company.

Blank filed the instant complaint on January 3, 2019, in the U.S. District Court for the Southern District of Ohio against Nationwide Corporation,[3] Nationwide Mutual Insurance Company, Penwell, and Glinski. Blank alleged that, in demoting and disciplining him, Nationwide engaged in reverse discrimination, having replaced him with a member of a protected class; retaliated against him for his reports to OAR; violated Ohio public policy; engaged in disability discrimination under Ohio Rev. Code § 4112.02, having replaced him with an individual who was not disabled; and engaged in age discrimination, having replaced him with an individual under 40.

---

[3] On February 25, 2019, Blank voluntarily dismissed Defendant Nationwide Corporation from the complaint.

He also alleged that Nationwide created a hostile work environment based on text messages Blank received from Hawk and Allocco that disparaged women as well as individuals belonging to particular ethnic, racial, and religious groups, and that Nationwide engaged in FMLA interference under 29 U.S.C. § 2615(a)(1) by contacting him regarding the demotion during his approved FMLA leave. As for Penwell and Glinski, he alleged that by falsely reporting to OAR that Blank made a racial slur, they committed (1) defamation and (2) intentional interference of his employment relationship with Nationwide.

The district court granted Nationwide's motion for summary judgment on all of Blank's claims. The court first determined that, as a matter of law, he could not pursue his Title VII claims for reverse discrimination, retaliation, and hostile work environment because he did not file a charge of discrimination with the EEOC before filing suit. Similarly, he could not pursue his age discrimination claim under the ADEA because he failed to file a charge of discrimination with either the EEOC or the Ohio Civil Rights commission before filing the present complaint. The district court also found that Blank had abandoned his intentional interference with employment relationship claim because he did not address it in his response opposing Defendants' motion for summary judgment.

Moving to the remaining claims, the district court determined that Blank could not establish a claim for wrongful discharge in violation of Ohio public policy because he had other statutory remedies available to him. Additionally, his disability discrimination claim could not survive summary judgment because he did not demonstrate a genuine dispute of material fact as to whether he was disabled as defined by Ohio statute and did not satisfy his burden to show that Nationwide's legitimate, non-discriminatory reason for disciplining and demoting him was pretextual. The district court concluded that his defamation claim against Penwell and Glinski failed because they

had a qualified privilege to make a good faith report to OAR on comments violating Nationwide's "No Harassment, Discrimination or Retaliation" policy, and Blank could not show that they acted with actual malice in reporting his comments. Finally, the district court determined that Nationwide was entitled to summary judgment on Blank's FMLA interference claim because he could not show that Nationwide's phone call to him to discuss the demotion—which occurred on the day his request for FMLA leave was approved—interfered with his ability to exercise his FMLA rights. This timely appeal followed.

## DISCUSSION

### Standard of Review

"We review a district court's grant of summary judgment de novo." *McClellan v. Midwest Machining, Inc.*, 900 F.3d 297, 302 (6th Cir. 2018). Summary judgment will be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one "that might affect the outcome of the suit," and a genuine dispute exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "At the summary judgment stage, the moving party bears the initial burden of identifying those parts of the record which demonstrate the absence of any genuine issue of material fact." *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 389–90 (6th Cir. 2008). Once the moving party has met its burden, the burden then shifts to the non-moving party to demonstrate "specific facts showing that there is a genuine issue for trial," although the evidence need not be "in a form that would be admissible at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (internal quotations omitted). All reasonable inferences will be drawn in favor of the non-moving party. *Mutchler v. Dunlap Mem'l Hosp.*, 485 F.3d 854, 857 (6th Cir. 2007).

**Analysis**

I.     **FMLA Interference**

Blank argues that the district court erred in granting summary judgment to Nationwide on his FMLA interference claim because he provided sufficient evidence that Nationwide interfered with his rights under the FMLA by contacting him regarding his demotion during his protected leave. Under the FMLA, qualifying employees are entitled "to up to twelve weeks of unpaid leave each year if, among other things, an employee has a 'serious health condition that makes the employee unable to perform the functions of the position of such employee.'" *Walton v. Ford Motor Co.*, 424 F.3d 481, 485 (6th Cir. 2005) (quoting 29 U.S.C. § 2612(a)(1)(D)). An eligible employee who takes leave under the FMLA "shall be entitled, on return from such leave . . . to the position of employment held by the employee when the leave commenced; or . . . to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment." 29 U.S.C. § 2614(a)(1).

The FMLA also provides that "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter" or "to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter." *Id.* § 2615(a). Based on the above statutory language, "[t]his court recognizes two distinct theories for recovery under the FMLA: (1) the 'entitlement' or 'interference' theory arising from 29 U.S.C. § 2615(a)(1); and (2) the 'retaliation' or 'discrimination' theory arising from 29 U.S.C. § 2615(a)(2)." *Hoge v. Honda of Am. Mfg., Inc.*, 384 F.3d 238, 244 (6th Cir. 2004). For a claim of FMLA interference, a plaintiff must show that (1) they were "an eligible employee," (2) the "defendant was a covered employer," (3) they were "entitled to leave under the FMLA," (4) they gave the "defendant notice of [their]

- 11 -

intent to take leave," and (5) "the defendant denied [them] FMLA benefits or interfered with FMLA rights to which [they were] entitled." *Harris v. Metropolitan Government of Nashville and Davidson County*, 594 F.3d 476, 482 (6th Cir. 2010).

The prong of the FMLA interference inquiry at issue is whether Nationwide's contact with Blank during his FMLA leave in connection with the investigation into his complaint and demotion constituted an interference with his FMLA rights. The Department of Labor ("DOL") and this Court have provided some guidance into what constitutes an interference with an employee's FMLA rights. For example, a DOL regulation provides that interfering with an employee's exercise of FMLA rights includes "refusing to authorize FMLA leave," "discouraging an employee from using such leave," and "manipulation by a covered employer to avoid responsibilities under FMLA." 29 C.F.R. § 825.220(b). We have previously indicated that discouraging an employee from taking FMLA leave includes asking an employee to work while they are on protected leave. *See Arban v. W. Publ'g Corp.*, 345 F.3d 390, 402 (6th Cir. 2003) (finding that "the jury was entitled to find in Arban's favor" based on evidence at trial demonstrating "that he was asked to continue to perform work-related tasks while ostensibly on medical leave" and that his supervisor "called him on several occasions and requested that he provide customer lists and pending sales"). Additionally, an employer's failure to respond to an employee's request for leave and inform them of their entitlement to take twelve weeks of leave is sufficient to "discourage[] [an employee] from taking leave" by making "it impossible for [the employee] to make the necessary plans" for leave. *Saroli v. Automation & Modular Components, Inc.*, 405 F.3d 446, 454 (6th Cir. 2005).

But an employer can engage in de minimis contact with the employee on leave without violating their FMLA rights. For example, in *Groening v. Glen Lake Community Schools*, we found that the school board was entitled to summary judgment on Groening's FMLA interference

claim where the only evidence of interference was her attendance at a board meeting, contact she initiated with the board and interim superintendent regarding work, and the board's "request for a breakdown of her time off." 884 F.3d 626, 632 (6th Cir. 2018). We reasoned that Groening could not "claim that the board interfered with her rights by responding to discussions *she* initiated," and the "de minimis request" for a time off breakdown—the "one instance where the board actually initiated contact with her"—did "not rise to the level of actionable interference." *Id.* And in *Allen v. Butler County Commissioners*, we reversed a grant of summary judgment to a county employee for FMLA interference, finding that the County's general call-in requirement for individuals on leave did not interfere with Allen's FMLA rights. 331 F. App'x 389, 396 (6th Cir. 2009).

Nationwide's contact with Blank during his leave did not interfere with his FMLA rights as it constituted de minimis contact that did not discourage him from, or otherwise interfere with, his, taking FMLA leave. Much of the contact cited by Blank as interfering with his leave occurred before his claim for FMLA leave was initiated on April 9, 2018, at 11:44 A.M. (*See* R. 65-1, Blank Aff. at PageID # 2431 ("On Monday April 2, 2018, I was contacted by Seema Anand from OAR. . . . At 6:15 P.M. after arriving home from work I received a call from Seema. . . . She advised that I was being put on paid administrative leave pending an investigation."); *id.* at PageID # 2432 ("On Monday, April 9, 2018[,] at 9:26 A.M. I received an email from Seema stating she was reminding me of our call at 11:00 A.M. . . . On Monday April 9, 2018, at 9:50 A.M. I received another call from Seema. She stated this was my official interview.").) Additionally, most of the contact with Nationwide following the approval of his FMLA leave occurred at Blank's initiation and was related to the Office of Ethics complaint he filed following his demotion. (*See* R. 43, Blank Dep. at PageID # 740 ("I contacted the Office of Ethics to . . . open a complaint . . . and then I compiled the complaint and sent it in."); *id.* at PageID # 770 ("April Compton wound up assigned

to reinvestigate my case, and it was agreed that she was not going to contact me again until I was close to being cleared to go back to work, which I was fine with.").)

Accordingly, the only contacts that Nationwide initiated during Blank's FMLA leave were the conference call with Nationwide leadership in which Blank learned that he was demoted and the call from Compton to discuss his Office of Ethics complaint. But as in *Groening*, these constitute de minimis contacts that did not discourage him from taking leave or interfere with his ability to take leave under the FMLA. *See* 884 F.3d at 632–33. Therefore, Blank cannot make out a prima facie case of FMLA interference to survive summary judgment.[4]

## II.      Disability Discrimination

Blank contends that the district court erred in granting summary judgment to Nationwide on his disability discrimination claim because he presented evidence that he was terminated based on his disability—sufficient for a prima facie case of disability discrimination—and that Nationwide's legitimate, non-discriminatory reason for terminating him was pretextual. Ohio law makes it unlawful for an employer, because of an individual's disability, "to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment."[5] Ohio Rev. Code § 4112.02(A). In order to demonstrate a prima facie case of disability discrimination under Ohio law, a plaintiff must show "(1) that he or she was disabled;

---

[4] Because Blank cannot make out a prima facie case of FMLA interference, we do not need to address whether Nationwide had a legitimate, non-discriminatory reason for interfering with his FMLA leave and if that proffered reason was pretextual. *See Donald v. Sybra, Inc.*, 667 F.3d 757, 762 (6th Cir. 2012) (finding that a previous panel of this Court "effectively adopted the *McDonnell Douglas* tripartite test without saying as much" in the context of analyzing a claim for FMLA interference).

[5] In his brief, Blank cites to the Americans with Disabilities Act ("ADA") in his argument regarding his disability discrimination claim; however, the complaint indicates that he is pursuing his disability discrimination claim pursuant to Ohio Rev. Code § 4112.02. This discrepancy does not change the analysis of the claim because we have previously indicated that "Ohio's disability-discrimination statute and the ADA employ the same analysis." *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 872 (6th Cir. 2007).

(2) that the employer took an adverse employment action against the employee, at least in part, because the employee was disabled; and (3) that the employee could safely and substantially perform the essential functions of the job in question despite his or her disability." *Stewart v. Bear Mgmt., Inc.*, 98 N.E.3d 900, 904 (Ohio Ct. App. 2017) (citing *Hood v. Diamond Prods., Inc.*, 658 N.E.2d 738, 741 (Ohio 1996)).

In cases involving indirect evidence of disability discrimination, "Ohio courts apply the burden-shifting test enunciated" in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973). *Jaber v. FirstMerit Corp.*, 81 N.E.3d 879, 886 (Ohio Ct. App. 2017). Accordingly, once a plaintiff demonstrates a prima facie case of disability discrimination, "the burden then shifts to the employer to set forth some legitimate, nondiscriminatory reason for the action taken." *Hood*, 658 N.E.2d at 741. And "if the employer establishes a nondiscriminatory reason for the action taken, then the employee or prospective employee must demonstrate that the employer's stated reason was a pretext for impermissible discrimination." *Id.* at 742.

In the present case, the parties dispute whether Blank was disabled by his fibromyalgia and depression for purposes of his disability-discrimination claim. Ohio law defines disability as "a physical or mental impairment that substantially limits one or more major life activities, including the functions of caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working; a record of a physical or mental impairment; or being regarded as having a physical or mental impairment." Ohio Rev. Code § 4112.01(A)(13). Under the relevant regulations interpreting the ADA's definitions, "[a]n impairment is a disability within the meaning of this section if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population," but the "impairment need not prevent, or

significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting." 29 C.F.R. § 1630.2(j)(1)(ii).

Blank asserts in his affidavit that due to his fibromyalgia he had "difficulty sleeping, walking, eating, concentrating, performing any form of aerobic exercise or any moderate non-aerobic exercise." (R. 65-1, Blank Aff. at PageID # 2435.) But in his deposition, when asked "was there something in [his] . . . day-to-day, that [he] could not do because of trying to investigate the issues with the pain," he responded that "in the months approaching all of this happening, [he] continued, to the best of [his] abilities, to come in and work just like [he] worked and to support [his] team just like [he] had always supported [his] team and to support the needs of [his] leadership and the customers." (R. 43, Blank Dep. at PageID # 768–69.) And he indicated in his deposition that during the time he and his doctors were trying to determine what was causing his pain, he continued to work, drive, and travel.

We have indicated that "[a] party may not create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts [their] earlier deposition testimony." *Reid v. Sears, Robuck and Co.*, 790 F.2d 453, 460 (6th Cir. 1986). The "district court deciding the admissibility of a post-deposition affidavit at the summary judgment stage must first determine whether the affidavit directly contradicts the nonmoving party's prior sworn testimony" or, if "there is no direct contradiction," whether the affidavit "constitutes an attempt to create a sham fact issue." *Aerel, S.R.L. v. PCC Airfoils, LLC*, 448 F.3d 899, 908–09 (6th Cir. 2006) (internal quotations omitted) (finding that a post-deposition affidavit did not directly contradict the deposition because the affidavit provided additional explanation of "the oral understandings [of the contract] that were alluded to but not explored during the three-hour deposition").

In the instant case, the affidavit directly contradicts Blank's deposition. When he was specifically asked if his conditions limited his ability to engage in any activities, he did not name any activities and instead remarked that he was trying to work, and did work, as he had prior to the onset of these conditions, as well as driving to work every day and travelling out of state. In contrast, the affidavit lists several activities—none of which Blank mentioned at the deposition that Blank claims to have difficulty completing as a result of the conditions, contravening his deposition testimony. *See Penny v. United Parcel Serv.*, 128 F.3d 408, 415 (6th Cir. 1997) (finding that "an affidavit claiming that plaintiff's hunting and fishing trips did not require him to walk" contradicted his deposition testimony indicating that he was able to hunt and fish during the time in which he alleged his disability impaired his walking). Accordingly, the district court correctly chose not to consider the affidavit in its summary judgment analysis on Blank's disability discrimination claim.

Notwithstanding, Blank's affidavit failed to create a genuine dispute of material fact regarding whether his conditions constituted a disability for purposes of his disability discrimination claim. His affidavit simply asserts that he has difficulty with certain activities due to his fibromyalgia, without further explanation of how and to what extent the fibromyalgia substantially limits his ability to complete these activities. This conclusory statement is not sufficient to demonstrate that his fibromyalgia substantially limited his ability to complete a major life activity. *See Penny*, 128 F.3d at 415 (finding that "Penny's deposition testimony provides little support for the claim that his impairment rises to the level of a disability" because "[a]side from statements that 'I limp on occasion' and 'It hurts to do my job everyday. Sometimes it hurts to

walk,' this testimony contains no detail about how his alleged disability hinders his ability to walk"). Accordingly, Blank cannot establish a prima facie case of disability discrimination.[6]

### III.    Defamation

Blank argues that the district court erred in finding that Penwell's and Glinski's qualified privilege defeated his defamation claim as a matter of law and that there was no evidence in the record showing that they acted with actual malice. He contends that he presented evidence that Glinski and Penwell knowingly reported a false statement to OAR regarding the jury avoidance remark and did so with actual malice, overcoming any privilege they had to report the statements.

Under Ohio law, "defamation occurs when a publication contains a false statement 'made with some degree of fault, reflecting injuriously on a person's reputation, or exposing a person to public hatred, contempt, ridicule, shame or disgrace, or affecting a person adversely in his or her trade, business or profession.'" *Jackson v. Columbus*, 883 N.E.2d 1060, 1064 (Ohio 2008) (quoting *A & B-Abell Elevator Co. v. Columbus/Cent. Ohio Bldg. & Constr. Trades Council*, 651 N.E.2d 1283, 1289 (Ohio 1995)). For a defamation claim, the plaintiff must establish "(1) that a false statement of fact was made, (2) that the statement was defamatory, (3) that the statement was published, (4) that the plaintiff suffered injury as a proximate result of the publication, and (5) that the defendant acted with the requisite degree of fault in publishing the statement."[7] *Am. Chem.*

---

[6] Because Blank has not demonstrated a prima facie case of disability discrimination, we need not address Blank's argument that Nationwide's legitimate, non-discriminatory reason for demoting and terminating him was pretextual.

[7] Ohio recognizes two forms of defamation: defamation per se, which "occurs when material is defamatory on its face," and defamation per quod, "which occurs when material is defamatory through interpretation or innuendo." *Sullins v. Raycom Media, Inc.*, 996 N.E.2d 553, 561 (Ohio Ct. App. 2013) (internal quotations omitted). Because Blank did not specify that he was pursuing a defamation per se claim in his complaint, we construe it as a defamation per quod claim, for which he must plead and prove any special damages. *See Ne. Ohio Elite Gymnastics Training Ctr., Inc. v. Osborne*, 916 N.E. 2d 484, 488 (Ohio Ct. App. 2009).

*Soc'y v. Leadscope, Inc.*, 978 N.E.2d 832, 852 (Ohio 2012) (internal quotations omitted). The court determines as a matter of law whether an allegedly defamatory statement is actionable. *Id.* at 853.

Where a plaintiff "establishes a prima facie case of defamation, a defendant may then invoke a conditional or qualified privilege." *Jackson*, 883 N.E.2d at 1064. The elements of a qualified privilege defense are as follows: (1) "good faith," (2) "an interest to be upheld," (3) "a statement limited in its scope to this purpose," (4) "a proper occasion," and (5) "publication in a proper manner and to proper parties only." *Hahn v. Kotten*, 331 N.E.2d 713, 719 (Ohio 1975). And "[w]here the circumstances of the occasion for the alleged defamatory communications are not in dispute, the determination of whether the occasion gives the privilege is a question of law for the court." *A & B-Abell Elevator Co.*, 651 N.E.2d at 1290. As relevant in the employment context, Ohio courts have determined that "a communication made in good faith on a matter of common interest between an employer and an employee, or between two employees concerning a third employee, is protected by qualified privilege." *Hanly v. Riverside Methodist Hosp.*, 603 N.E.2d 1126, 1131 (Ohio Ct. App. 1991).

The district court determined that Penwell and Glinski had a qualified privilege to report Blank's jury duty comment because Nationwide, Penwell, and Glinski "had a shared interest in keeping the workplace free of conduct violating Nationwide's 'No Harassment, Discrimination, or Retaliation Policy,' and Defendants Penwell and Glinski's communications to OAR were intended to protect that interest." (R. 75, Op & Order at PageID # 2714.) On appeal, Blank concedes that Penwell and Glinski had a qualified privilege to make these statements and argues instead that there was sufficient evidence to create a genuine dispute of fact regarding whether Penwell and Glinski acted with actual malice in reporting his comment. Therefore, we do not

disturb the district court's finding that Penwell and Glinski had a qualified privilege to report Blank's jury duty comment.

If a defendant can successfully invoke a qualified privilege, then the "qualified privilege may be defeated only if a claimant proves with convincing clarity that a publisher acted with actual malice." *Jackson*, 883 N.E.2d at 1064. A publisher acts with actual malice when they publish a statement "with knowledge of its falsity or with reckless disregard of whether it was false or not." *Sullins*, 996 N.E.2d at 563. Reckless disregard indicates a situation where the "publisher of defamatory statements acts with a high degree of awareness of their probable falsity, or when the publisher in fact entertained serious doubts as to the truth of his publication." *Jackson*, 883 N.E.2d at 1064 (internal quotations and citations omitted). And "[w]here a defamatory statement is subject to a qualified privilege, actual malice will not be presumed." *Sullins*, 996 N.E.2d at 563 (internal quotations and citation omitted).

The district court correctly found that Blank could not point to any evidence in the record indicating that Penwell and Glinski reported his jury duty remark with actual malice. Blank has not demonstrated that Glinski and Penwell made the statement to OAR regarding his use of a racial slur with knowledge of its falsity or reckless disregard of whether it was false. Instead, Blank's argument regarding the existence of actual malice stems from his erroneous contentions that Glinski and Penwell lied in their statements to OAR about Blank using a racial slur and that Nationwide concluded that Glinski's and Penwell's statements regarding Blank's use of the racial slur were false and closed the investigation as a result of that conclusion.

Importantly, Nationwide did not conclude that Glinski's and Penwell's statements were false. Per Blank's deposition, after he spoke to Anand and denied using the racial slur, she decided to close the case because "[his] record with the company has been good, [he had] been a great

performer, [he had] an extremely diverse team, and . . . she did not see anything in [his] history that would indicate that this was [his] kind of behavior, and so to that end, she was considering the case closed." (R. 43, Blank Dep. at PageID # 688.) Anand's case notes indicate that after denying using the racial slur she "coached him on how this is very inappropriate for workplace and could hurt feelings," Blank "seemed to understand and would be cognizant in the future," and having "coached Greggory Blank, the case is closed." (R. 41-1, Anand Case Notes at PageID # 558.) And Blank mischaracterizes the testimony of Kyle Waltz, who was present during the conversation. Waltz did not dispute Blank's use of the racial slur; instead, he said that he "did not hear what they were talking about" and was not "actually inside the break room" where Penwell, Glinski, and Blank were talking but rather in the hallway outside. (R. 56, Waltz Dep. at PageID # 2298.) Even considering this evidence in the light most favorable to Blank, it does not show that Penwell and Glinski reported his comment to OAR with actual malice.[8]

Blank's citation to *Ball v. British Petroleum Oil*, 670 N.E.2d 289 (Ohio Ct. App. 1995), is inapposite. In that case, the individual who made the allegedly defamatory statement "testified that he held a personal belief that [Ball] was involved in illegal drug activity," but that the "investigation never uncovered any proof that appellant had been involved in an illegal drug transaction aside from the statement of the cafeteria manager." *Id.* at 294. And his allegation that Ball was involved in illegal drug activity stemmed from the cafeteria manager's conversation with a cashier who said that the "big guy" gave the cashier drugs and the cafeteria manager's assumption

---

[8] Blank also contends that text messages between Glinski and Penwell indicating their desire for Blank to be terminated and Glinski's notes on her "One Note" asking another associate director about reporting Blank for retaliation demonstrates that they acted with actual malice in reporting his jury duty remark to OAR. At best, however, this evidence shows that Glinski and Penwell bore some animus against Blank, and the Ohio Supreme Court has indicated that "[a]ctual malice may not be inferred from evidence of personal spite, ill-will or intention to injure on the part of the writer." *Scott v. News-Herald*, 496 N.E.2d 699, 704 (Ohio 1986).

that Ball was the "big guy" to whom the cashier was referring. *Id.* In the present case, neither Glinski nor Penwell have contradicted their position that Blank used a racial slur in his comment on jury duty that he made directly to Penwell and Glinsky. And Blank does not dispute the comment itself—or that the comment even without the slur was offensive—only that he did not use the racial slur. Ultimately, Blank has failed to meet his burden on summary judgment to demonstrate a genuine dispute of material fact regarding whether Penwell and Glinski acted with actual malice in reporting his jury duty comment to the OAR and cannot overcome their qualified privilege to report his statement.[9]

## CONCLUSION

For these reasons, we **AFFIRM** the district court's order granting summary judgment to Defendants.

---

[9] Even assuming that Glinski and Penwell acted with actual malice, as a separate basis for summary judgment, the district court correctly found that the alleged harm—his demotion—was not caused by Penwell and Glinski's allegedly defamatory statement to OAR but rather the separate investigation into allegations that he was retaliating against Penwell and Glinski for their report. Blank was not disciplined as a result of the investigation into his jury duty remark, and the case was closed following his conversation with Anand.